UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| LAURIE DOBSON, JANE MOORE, WELLS R. STALEY-MAYS, CHRISTIAN VENABLE, GARY HIGGINBOTTOM, and EDWARD COHEN, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CV-08-292-B-W |
| MATTHEW DUNLAP, Secretary of State for the state of Maine, in his official, capacity, JULIE FLYNN, Deputy Secretary of State for the state of Maine, in her official capacity, and the MAINE DEPARTMENT OF THE SECRETARY OF STATE, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**ORDER ON PLAINTIFFS' EMERGENCY MOTION FOR A PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER**

There is no constitutional right to procrastinate. Laurie Dobson, an independent candidate for United States Senate, waited until the last moment to deliver her nomination petitions to the municipal registrars in the state of Maine and when they failed to promptly certify all of her petitions, she failed to meet the statutory deadline to file 4,000 certified voter signatures with the Secretary of State. As a result, her name will not appear on the state's November 4, 2008 ballot. She and five supporters filed suit alleging that the failure of the statute to mandate a quick turnaround by the registrars and the absence of an adequate means of redress constitute violations of the United States Constitution's First and Fourteenth Amendments. They now move for an emergency injunction, demanding that the Court order the state to insert her

name in the ballot as an independent candidate for United States Senate.  The Court rejects their demands.  The Court concludes that Ms. Dobson's causes of action are barred by principles of claim preclusion and by the *Rooker-Feldman* doctrine.  The Court further concludes that her supporters' claims are barred under the equitable doctrine of laches and, even if the merits of their claims are reached, the absence of a statutory turnaround provision is not of constitutional dimension and, contrary to their contentions, Maine law does provide an adequate means of redress.

## I.   BACKGROUND

### A.   The Statutory Nomination Process

To be on the ballot in the state of Maine, a candidate for United States Senate must present the Secretary of State a nomination petition signed by at least 4,000 and not more than 6,000 eligible voters.  21-A M.R.S.A. § 354(5)(C).  Before a nomination petition may be filed with the Secretary, each petition must be delivered to the town registrar and the registrar must "certify which names on the petition appear in the central voter registration system as registered voters in that municipality."  21-A M.R.S.A. § 354(7)(B), (C).  Once certified, the petition may then be filed, and the Secretary is required to review it; "if the petition contains the required number of certified names and is properly completed, [the Secretary] shall accept and file it."  21-A M.R.S.A. § 356(1).  The Secretary then certifies the nomination.  21-A M.R.S.A. § 357.

Maine law controls the timing of the petition process.  A nomination petition "may not be signed before January 1st in the election year in which it is to be used."  21-A M.R.S.A. § 354(6).  Usually, a petition must be presented to the registrars by 5 p.m. on May 25 and filed with the Secretary by 5 p.m. on June 1; however, as May 25, 2008 fell on Sunday and Monday was Memorial Day, the due dates for presentation of the petitions to the registrars and for filing with

the Secretary were moved to May 27, 2008 and June 2, 2008, respectively.  1 M.R.S.A. § 71(12);
Me. R. Civ. P. 6(a).

### B.  The Dobson Nomination Petition

Between January 1, 2008 and May 27, 2008, Laurie Dobson gathered 5,138 signatures in various communities across the state for nomination as an independent candidate for United States Senate and she "mailed or hand delivered the signed petitions to the municipalities for certification by the clerks and/or registrars on or before 5:00 p.m. May 27, 2008."  *Pl.'s Complaint* ¶ 14 (Docket # 1).  Approximately 50 petitions "were not certified and returned to [Ms.] Dobson until after 5:00 p.m. on June 2, 2008."  *Id.* ¶ 15.  Before 5:00 p.m. on June 2, 2008, Ms. Dobson submitted to the Secretary of State "all of those petitions which were timely returned to her."  The total number of signatures on those petitions was 4,848 of which 1,008 had been rejected by the various clerks and/or registrars," leaving her just under the 4,000 minimum.  *Id.*  Based on Ms. Dobson's failure to file at least 4,000 certified signatures by 5:00 p.m. on June 2, 2008, the Secretary of State did not certify Ms. Dobson's name and her name will not appear on the November 4, 2008 ballot.

Between June 2 and June 6, Ms. Dobson continued to receive certified petitions from registrars and she attempted to file those petitions with the Secretary of State.  *Id.* ¶ 16.  The number of certified signatures on the timely and untimely-filed petitions totaled 4,089.  *Id*.  Ms. Dobson requested an extension to file these additional petitions, but the Deputy Secretary declined her request as beyond her legal authority.  *Id.* ¶ 18; *Aff. of Julie Flynn*, Ex. 9-5 (Docket # 8) (*Flynn Aff.*).  Ms. Dobson also asked the Secretary to compare the invalidated signatures against the Central Voter Registration System and she requested an opportunity pursuant to 21-A M.R.S.A. § 356(2) to challenge the 1,008 rejected signatures.  *Id.* ¶ 17.  The Secretary of State

3

also rejected these requests, but suggested to Ms. Dobson that she might seek judicial review pursuant to the Administrative Procedure Act, 5 M.R.S.A. § 11001-11008.  *Id.* ¶ 18; *Flynn Aff.* Ex. 9-3.

### C.  The Dobson State Legal Proceeding

On June 24, 2008, Ms. Dobson filed a Rule 80C petition for review of agency action in the Kennebec County Superior Court for the state of Maine.  *Def.'s Memo. in Opp'n to Pl.'s Emergency Mot. for a Preliminary Injunction* Ex. 8-2 (Docket # 8) (*Def.'s Memo*).  She also moved to present additional evidence and for an expedited hearing.[1]  *Id.*  Ex. 8-3, 8-4.  On August 27, 2008, the Superior Court Justice granted the motion for expedited hearing, and denied the motion to present additional evidence and the Rule 80C petition.  *Id.*  Ex. 8-7.

Ms. Dobson appealed to the Supreme Judicial Court of Maine.  On August 29, 2008, after an expedited hearing, the Law Court denied her appeal.  *Dobson v. Dep't of the Secretary of State*, 2008 ME 137; 2008 Me. LEXIS 135.  The Maine Supreme Judicial Court affirmed the Superior Court's "judgment affirming the Secretary of State's final agency action concluding that it lacked the authority to extend the statutory filing deadline and denying Dobson a hearing to review the actions of the local election officials."  *Id.* ¶ 2.  The Court refused to hear Ms. Dobson's constitutional challenge, because it was "raised for the first time by Dobson in her appeal to this Court."  *Id.* ¶ 3.

### D.  The Pending Action

On September 8, 2008, Ms. Dobson and five other individuals filed suit in this Court, claiming that the state of Maine statutory nomination process imposes an impermissible burden

---

[1] The state court docket reveals:  On July 22, 2008, Ms. Dobson's original lawyer withdrew the petition for judicial review; two days later, her current counsel entered his appearance and on July 29, 2008, the Plaintiff moved to reinstate the petition.  The original lawyer's motion to withdraw was granted on August 26, 2008 and on the same day, the Superior Court granted the motion to reinstate the petition.  *Def.'s Memo.* Ex. 8-7.

on their exercise of First and Fourteenth Amendments rights and that the absence of a means to challenge the decisions of the town registrars constitutes a denial of due process under the First and Fourteenth Amendments. *Compl.* They contemporaneously filed an emergency motion for a temporary restraining order and preliminary injunction. *Emergency Mot. for a Preliminary Injunction and Temporary Restraining Order* (Docket # 4) (*Emergency Mot.*). On September 11, 2008, the Secretary of State responded to the emergency motion. *Defs.' Memo.* On September 12, 2008, the Court heard oral argument.[2]

In their first Count, the Plaintiffs focus on the absence of a statutory time period within which the registrars must certify and return the nomination petitions and the lack of any coordination between the date the petitions are due at the registrars and the date by which they must be certified. They contend that the absence of a deadline by which registrars must return certified petitions "gives the municipal election officials *de facto* power to prevent a candidate from filing in time to appear on the ballot." *Compl.* ¶ 25. Here, for example, not all of the nomination petitions submitted by Ms. Dobson by 5:00 p.m. on May 27, 2008 were certified and returned to her by 5:00 p.m. on June 2, 2008. The Plaintiffs claim that the absence of a statutorily imposed deadline on the registrars constitutes a violation of their First and Fourteenth Amendment rights, restricting their rights of political expression, association, and voting and the right to petition for redress of grievances.

In Count Two, the Plaintiffs claim that their Fourteenth Amendment rights to substantive due process were violated by the absence of a means by which they can contest the registrars'

---

[2] The parties placed difficult time constraints on the Court. The Court first became aware of the existence of this controversy on Monday, September 8, 2008. A hearing was scheduled for Friday, September 12, 2008. As the Court attempted to familiarize itself with the magnitude of the parties' disagreements, the parties filed memoranda on September 10, 2008 and September 11, 2008. This Court has done its level best, but the parties should appreciate "the temporal constraints under which the district court labored" in arriving at this decision. *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 15 (1st Cir. 2004).

refusals to certify names on the nomination petition.  They point out that the Secretary has interpreted 21-A M.R.S.A. § 356(2), which provides a means to challenge the validity of a nomination petition or the names on the petition, to allow only the invalidation of signatures that were validated, not to validate signatures that were invalidated.  Although an individual voter can contest a registrar's refusal to enter the person's name in the central voter registration system or a registrar's rejection of a voter registration application, they say that process is too cumbersome and lengthy to provide for relief within the nomination petition deadlines.  *See* 21-A M.R.S.A. § 103.  Finally, they contend that neither Rule 80B nor 80C provides a means to remedy the failure of a registrar to certify a name.

## II.  DISCUSSION

### A.  Laurie Dobson, Claim Preclusion and *Rooker-Feldman*

Laurie Dobson's claim in federal court faces two insurmountable preliminary hurdles: claim preclusion and the *Rooker-Feldman* doctrine.  In *Hoffman v. Sec'y of state of Maine*, Civil No. 08-279-P-H, 2008 U.S. Dist. LEXIS 67120 (D. Me. August 29, 2008), Judge Hornby addressed a nearly identical case.  Like Ms. Dobson, Mr. Hoffman wished to be listed on the ballot as an independent candidate for United States Senate in Maine, there was a legal challenge to the Secretary's determination, and the Law Court had ruled against the candidate.[3]  Applying claim preclusion, Judge Hornby ruled that Mr. Hoffman was foreclosed "from raising now in this new federal lawsuit about his ballot access any arguments that he could have made in the earlier

---

[3] There are differences between Mr. Hoffman's and Ms. Dobson's cases that are immaterial to the concept of claim preclusion and the application of the *Rooker-Feldman* doctrine.  In Mr. Hoffman's case, the Secretary invalidated three signatures, but concluded that Mr. Hoffman had presented 4,122 signatures, a sufficient number for nomination.  *Knutson v. Dep't of Sec'y of State*, 2008 ME 124 ¶ 5-6, 2008 ME. LEXIS 125, *3-5, __A.2d__ (July 28, 2008).  A Maine voter, John Knutson, challenged the Secretary's certification of Mr. Hoffman's nomination pursuant to 21-A M.R.S.A. § 354(7)(A).  After the Secretary rejected Mr. Knutson's arguments, he appealed to the Superior Court pursuant to Rule 80B.  The Superior Court affirmed the Secretary and Mr. Knutson appealed to the Supreme Judicial Court of Maine.   The Law Court vacated the Superior Court judgment and remanded the case to vacate the Secretary's decision.

lawsuit." *Id.* at *15. He also noted that Mr. Hoffman's claim was "probably also precluded by the so-called Rooker-Feldman doctrine." *Id.* at *16 n.4.

For precisely the reasons Judge Hornby articulated in *Hoffman*, the Court concludes that Ms. Dobson's lawsuit is foreclosed both by principles of claim preclusion and by the *Rooker-Feldman* doctrine. The Supreme Judicial Court of Maine has issued a final judgment on a lawsuit that Ms. Dobson filed in state court that either raised or could have raised the same questions that Ms. Dobson asks this Court to rule on.[4] *Hoffman* applies to Ms. Dobson's claim with full and preclusive force. Recognizing the persuasive effect of *Hoffman*, Ms. Dobson seeks to distinguish her case. She claims without authority that she could not have raised a federal constitutional question in her state cause of action.[5] Simply put, she is wrong. Rule 80C(i) explicitly provides for joinder of claims. Me. R. Civ. P. 80C(i) ("If a claim for review of governmental action under this rule is joined with a claim alleging an independent basis for relief from governmental action, the petition shall contain a separate count for each claim for relief asserted, setting forth the facts relied upon, the legal basis of the claim, and the relief requested."); *Fleming v. Comm'r, Dep't of Corrections*, 795 A.2d 692, 695 (Me. 2002) ("Rule 80C anticipates that a plaintiff (or petitioner) may add an independent claim for damages, and the rule provides a procedure for handling that independent claim."); *Berry v. Board of Trustees*, 663 A.2d 14, 16 (Me. 1995) ("Plaintiffs sought judicial review pursuant to M. R. Civ. P. 80C and jointly filed a complaint requesting a declaratory judgment that the Board's actions unconstitutionally impaired contractual obligations owed to them in violation of Article 1, section 10 of the U.S. Constitution . . . .").

---

[4] Counsel for Ms. Dobson confirmed at oral argument that she has not sought certiorari in the United States Supreme Court.

[5] The Law Court did not reach the constitutional issues that Ms. Dobson attempted to raise during oral argument, since they were not presented to the Superior Court. *Dobson*, at ¶ 3.

Ms. Dobson's law suit is barred by claim preclusion and the *Rooker-Feldman* doctrine.

## B. The Voters

### 1. Claim Preclusion, *Rooker-Feldman* and the Voter Plaintiffs

In addition to Ms. Dobson, there are five voter plaintiffs (voters), who were not parties in her state court litigation and, therefore, are not prevented from proceeding with their claims in this Court. *See, e.g.*, *Griffin v. Burns*, 570 F.2d 1065, 1072 (1st Cir. 1978); *Hoffman v. Secretary of State*, 2008 U.S. Dist. LEXIS 67120 (D. Me. August 29, 2008) at *17.

### 2. Laches

The voters' first obstacle is laches. Laches is "an equitable doctrine which penalizes a litigant for negligent or willful failure to assert his rights." *Valmor Products Co. v. Standard Products Corp.*, 464 F.2d 200, 204 (1st Cir. 1972). Equity "ministers to the vigilant, not to those who sleep upon their rights." *Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 879 (1st Cir. 1995). However, to bar the assertion of a claim, laches requires that the party's delay in bringing the lawsuit was "1) unreasonable, and 2) resulted in prejudice to the opposing party." *Sch. Union No. 37 v. Ms. C.*, 31, (1st Cir. 2008) (quoting *K-Mart Corp. v. Oriental Plaza, Inc.* 875 F.2d 907, 911 (1st Cir. 1989)). Further, laches is an affirmative defense and a defendant claiming laches has the burden "of proving both unreasonableness of the delay and the occurrence of prejudice." *K-Mart*, 875 F.2d at 911. The proponent of the doctrine "must make a clear showing of prejudice." *Sch. Union No. 37*, 518 F.3d at 35.

Here, the Secretary raised the equitable defense of laches. *See Def.'s Memo.* at 12-13. According to the record, the Deputy Secretary of State rejected Ms. Dobson's petition as invalid

on June 2, 2008.[6]  *See Flynn Aff.* Ex. 2A, ¶ 5.  The voters had from early June, 2008 to file a

legal action, challenging this determination; however, they failed to take any action until

September 8, 2008.  The voters offered no reasonable explanation for their delay.  It may be that

they were waiting for Ms. Dobson's civil action in state court to be resolved before proceeding to

secure their own rights, but at oral argument, they argued that, since they were not parties to the

Dobson state action, they should not be bound by the principles of claim preclusion and the

*Rooker-Feldman* doctrine that bar Ms. Dobson's cause of action.  The voters cannot have it both

ways:  they cannot dissociate themselves from the Dobson action for purposes of preclusion, but

join the Dobson action for purposes of delay.

The Secretary has presented convincing proof of prejudice from the voters' delay.  The

Secretary has undertaken numerous steps to prepare and print the November ballots.  *See id.*  To

comply with federal and state guidance, which ensures that military personnel, other overseas

voters, and absentee voters not only have the right to vote, but the right to have their ballots

counted on Election Day, the Secretary began the ballot preparation process on August 18, 2008

and finished the process of laying out the ballot styles by the close of business on August 29,

2008.  *Id.* ¶ 14, 18.  By September 8, 2008, the date the lawsuit was filed in this case, the printer

had already begun the ballot printing process and by affidavit dated September 11, 2008, the

Deputy Secretary estimated that the Elections Division staff had "invested approximately 225

person hours in designing, preparing and proofing the paper ballots, and another 60 person hours

preparing for the audio and computer generated ballots used in the accessible voting system."  *Id.*

¶ 21.  The Court concludes that to issue the injunction the voters demand would have the effect

---

[6] The exact date that the Secretary rejected the petition is not explicit.  However, by letter dated June 3, 2008, Ms.
Dobson wrote the Deputy Secretary of State, asking the Secretary to review the names submitted in her nomination
petitions against the statewide voter registration list.  *Flynn Aff.*, Ex. 9-6.

of stopping the presses and would run the risk of restricting the voting rights of other voters, including overseas members of the military.

The unwarranted delay by the voters and the resulting prejudice to the Secretary justify a denial of the voters' claims on both counts. *See Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990), cert den. 501 U.S. 1206 (finding claims barred by laches where plaintiffs filed suit three weeks before general election to challenge decisions by Secretary of State made public eleven weeks before); *Kay v. Austin*, 621 F.2d 809, 813 (6th Cir. 1980) (applying laches where candidate waited to file suit until two weeks after he knew he would not be listed on ballot); *Liddy v. Lamone*, 919 A.2d 1276 (Md. 2007) (concluding that trial court erred in failing to apply equitable doctrine of laches to bar plaintiff's challenge to candidate's qualifications, filed too close to election). This case stands in contrast to *Stoddard v. Quinn*, where Judge Carter of this Court concluded that laches was inapplicable to a nominating petition challenge by an independent candidate for United States Senate. 593 F. Supp. 300 (D. Me. 1984). In *Stoddard*, the candidate filed suit on July 3, about four months before the election and there was no evidence that the Secretary had begun the ballot preparation and printing process. *Id.* at 302, 308-09. Here, the prejudice to the Secretary in stopping the printing presses is manifest. The Court concludes that the voters' claims are barred by the equitable doctrine of laches.

### 3.  Merits

Even though the voters' claims are barred by laches, in excess of caution, the Court will address the merits of their claims.

### a.  Maine Law

The Court joins Judge Hornby's admonition:  "The Maine Law Court is the final authority on interpreting Maine law." *Hoffman*, *12. This Court's concern cannot be the

Supreme Judicial Court of Maine's decision in *Dobson* and the Court accepts as authoritative and definitive the *Dobson* Court's conclusion that the Secretary lacked authority to extend the statutory filing deadline and its affirmance of the Superior Court's denial of a hearing to review the actions of local election officials. *Dobson*, ¶ 2. Instead, as in *Hoffman*, this Court's focus is solely "with federal questions, specifically, the plaintiffs' assertions that leaving [Dobson] off the ballot is so fundamentally unfair as to deny them substantive due process of law, as guaranteed by the Fourteenth Amendment, and their claims concerning their First Amendment rights of political expression, association, petition for redress of grievances, and voting." *Hoffman*, *12-13.

### b.  The Standard

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curium) (emphasis in original) (quoting 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948, pp. 129-130 (2d ed. 1995)). To succeed, the voters must show "(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest." *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003). The likelihood of success on the merits is "[t]he sine qua non of this four-part inquiry." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).

### c.  Count One – Impermissible Burden on First and Fourteenth Amendment Rights

The United States Constitution expressly authorizes the states to prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives." U.S. Const. art. I. § 4, cl. 1. The states, therefore, "retain the power to regulate their own elections." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). As the Supreme Court noted, state regulation of elections enhances the democratic process: "Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Id.* (internal punctuation and citation omitted). "Fair, honest, and orderly elections do not just happen. Substantial state regulation is a prophylactic that keeps the democratic process from disintegrating into chaos. Consequently, there is a strong interest in regulating all phases of the electoral process, including ballot access." *Perez-Guzman v. Gracia*, 346 F.3d 229, 238 (1st Cir. 2003).

At the same time, the Supreme Court has observed that "[t]he impact of candidate eligibility requirements on voters implicates basic constitutional rights." *Anderson v. Celebreezze*, 460 U.S. 780, 786 (1983). In *Anderson*, the Supreme Court rejected a strict scrutiny test in favor of a balancing test to determine whether the challenged electoral regulation unconstitutionally burdens the exercise of First and Fourteenth Amendment rights. *Id.* at 789. In evaluating constitutional challenges to ballot access laws, the Court

> must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed" by its rule.

*Burdick*, 504 U.S. at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). "[N]ot all restrictions imposed by the States on candidates' eligibility for the ballot impose constitutionally

suspect burdens on voters' rights to associate or to choose among candidates." *Anderson*, 460 U.S. at 788. "The right to vote is 'heavily burdened' if that vote may be cast only for major-party candidates at a time when other parties or other candidates are 'clamoring for a place on the ballot.'" *Id.* (quoting *Lubin v. Panish*, 415 U.S. 709, 716 (1974)).

A regulation presenting a severe burden must be justified by a compelling interest and must be narrowly tailored to serve that interest. *Anderson*, 460 U.S. at 789. A state law that imposes "reasonable, nondiscriminatory restrictions" is constitutionally permissible if it serves important state regulatory interests. *Burdick*, 504 U.S. at 434. The basic question is whether a "reasonably diligent independent candidate [could] be expected to satisfy the signature requirements." *Storer v. Brown*, 415 U.S. 724, 742 (1974).

The voters assert in Count One that the Secretary's refusal to accept Ms. Dobson's nomination petitions filed after June 2, 2008 violated their rights under the First and Fourteenth Amendments. They contend that the absence of an explicit statutory deadline in 21-A M.R.S.A. § 354 by which certified petitions must be returned by municipal election officials to candidates places an undue burden on independent candidates, because it creates the possibility that municipal election officials will fail to certify and return all submitted petitions in time for candidates to timely file the petitions with the Secretary of State to gain access to the ballot.[7] They bolster their argument by pointing out that Ms. Dobson had filed all her nomination petitions with the registrars by the statutory deadline of May 27, but it was the registrars who failed to certify the petitions so that they could be filed with the Secretary by June 2.

---

[7] The voters' claim is unusual in that it is primarily a challenge to the non-existence of a requirement that they contend must be in state law rather than an assertion that existing ballot access requirements are unconstitutionally onerous.

The flaw in Ms. Dobson's argument is that the statute does not require her to file the nomination petitions with the registrars <u>on</u> May 27; it requires that she file the nomination petitions with the registrars "<u>by</u> 5 p.m. on May [27]."  21-A M.R.S.A. § 354(7)(B) (emphasis supplied).  It is true that the interval between May 27 and June 2 is relatively short, and there was an intervening weekend, leaving only four working days between the latest time she could file a petition for certification with the registrars and the latest time she had to file the certification with the Secretary.  But, this brief interval is not a state secret; it is state law.  A reasonably prudent candidate could and should anticipate the short turnaround time for the registrars and avoid procrastination by filing for and obtaining certifications throughout the signature gathering interval and well in advance of the deadline.

Instead, Ms. Dobson adopted a dilatory strategy, electing to wait until all her nomination petitions were completed before presenting any of them to the registrars.  According to the Deputy Secretary, the signatures on many of the twenty-three late filed petitions "were collected several weeks, or months, before the deadlines for submission to the local registrars and the Secretary of State."  *Aff. of Julie Flynn* ¶ 9(e).  She noted that on one petition the late voter signature was dated January 17, 2008, on another the last signature was dated February 2, 2008 and on a third the last was April 12, 2008.  *Id.*  Ms. Flynn also observed that "[a]ll the voter signatures on an additional 19 petitions were collected before the end of April, 2008."  *Id.* ¶ 9(f).  If Ms. Dobson had filed her nomination petitions with the registrars as she completed them, the time constraints of which she now complains would not have been an issue.  She chose to wait until mid-May to file all her petitions with the registrars.[8]

---

[8] *See Flynn Aff.* Ex. 9-2.  A number of municipal registrars did not indicate a 'date received' on the petitions submitted by Ms. Dobson.  Nevertheless, the date can be estimated by referencing the 'date of the circulator's oath' because each petition must include the circulator's oath prior to submission to municipal registrars under 21-A

Ms. Dobson has given only the barest of excuses as to why she did not file the petitions earlier.  At oral argument, she claimed that if the petitions had been certified earlier, she would not possess the organizational capacity to keep track of them.   But, she did have the organizational ability to collect thousands of signatures, to obtain the circulator's oath on numerous petitions, to deliver or mail them to a host of registrars, and to file a significant number with the Secretary.  Ms. Dobson had the statutory right to wait until 5 p.m. on the statutory deadline before delivering the petitions to the municipal registrars for certification, but consequences of her decision to delay until the last possible moment is not of constitutional significance.

The constitutional standard contemplates a reasonably diligent independent candidate, not a last-minute procrastinator.  The law can expect a reasonably diligent independent candidate to use the nearly five months from January 1 until May 25 to gradually accumulate certified petitions.  That Ms. Dobson nearly succeeded gaining access to the November ballot despite an organizational strategy perhaps best described as risky supports the reasonableness of the burdens imposed by the statute.

Past experience of independent candidates in Maine is instructive.   Since 2000, independent candidates have been on the Maine ballot for President, United States Senator, and Governor.  *Flynn Aff.* ¶ 11 and Exh. 3.  Ms. Dobson cites Herbert Hoffman's recent failure to gain access to the ballot, but she has presented no evidence that independent candidates have been consistently, or even frequently, unable to comply with the requirements set forth in 21-A M.R.S.A. § 354.

---

M.R.S.A. § 354(7-A). The earliest 'date of circulator's oath' on Ms Dobson's petitions is May 10, 2008; the latest is May 24, 2008.

Plaintiffs argue that the absence of a statutory date by which local officials are bound to return certified petitions effectively gives local officials total discretion over the ballot access process. *Compl.* While it is true that local officials are not statutorily required to return petitions by a specified date, they are not nearly as autonomous as Plaintiffs suggest. Under the statute, "[t]he registrar . . . *shall certify* which names on a petition appear . . . as registered voters." 21-A M.R.S.A. § 354(7)(C) (emphasis added). Each year, the Secretary's Elections Division issues written guidance and provides training to local officials. *Flynn Aff* ¶ 4. Ms. Dobson's own experience with the local officials is inconsistent with her portrayal of them as unaccountable mavericks. Despite the last minute delivery of her petitions for certification, local officials failed to certify only 23 of Ms. Dobson's 618 petitions. *See Flynn Aff.* ¶ 9. This Court finds that both on its face, and in practice, the burdens imposed by the petition requirements under 21-A M.R.S.A. § 354 are slight.

In contrast, Maine's interests are significant. The Plaintiffs suggest that Ms. Dobson's trouble could easily be avoided, if only Maine enacted a law that imposes a turnaround time on Maine's registrars. However, to enact a certification deadline on the registrars would reward the dilatory and shift the onus of their delay onto the registrars. Secure in the knowledge that registrars are legally obligated to rapidly certify their petitions, candidates would have little incentive to obtain early certification and thereby ease the resulting crush on Maine's registrars. Further, such a law would presume a uniformity of resources in registrar offices across the entire state; what may be possible in more urban areas of the state may well be wholly impractical in the isolated villages of rural Maine. Finally, the statutory imposition of a deadline on the registrars would create a fertile source of controversy and litigation, pitting candidates against

registrars with charges and counter-charges centered on when the petitions were delivered and when they should have been certified.

In the end, however, the United States Constitution itself answers the Plaintiffs' complaint. The Constitution expressly leaves judgments about the time, place, and manner of elections to the state legislators, not to federal judges. Absent an infirmity of constitutional magnitude, Maine's statutory deadline for filing with the Secretary of State, just before the June primary, is well within the constitutionally acceptable range. *See, e.g., Lawrence v. Blackwell*, 430 F.3d 368, 374, n. 2 (6th Cir. 2005). The Plaintiffs have failed to show that the requirements in 21-A M.R.S.A. § 354 are discriminatory or unreasonable in light of Maine's need to conduct elections efficiently.

Lastly, the state's interest in this motion is particularly compelling. To add the name of Ms. Dobson or leave a blank for possible later addition at this late date would require substantial effort and significant expense. *See Flynn Aff* ¶¶ 12-22. The resulting delay in ballot production would risk non-compliance with federal guidelines and jeopardize the voting rights of overseas civilians and military personnel. *Flynn Aff* ¶ 22.

Applying the balancing test in *Anderson*, the Court concludes that the burden imposed by Maine's petition requirement statute on the constitutional rights of the voters is slight, and clearly outweighed by the state's interests.

### d.   Count Two – Violation of Substantive Due Process

In Count Two, the voters contend that they were denied their Fourteenth Amendment rights to substantive due process by the absence of an adequate means by which they or their candidate could contest the registrars' refusals to certify names on nomination petitions.

The voters focus on the absence of a remedy under 21-A M.R.S.A. § 356. Under § 356(2), "[o]nly a registered voter residing in the electoral division of the candidate concerned" may challenge the validity of a nomination petition or of names upon a petition in an administrative hearing. 21-A M.R.S.A. § 356(2). A candidate, despite being a registered voter, is barred from seeking a hearing.[9] *See id*; *Dobson* at ¶ 2. The hearing provisions of § 356(2) address the situation where a voter desires to challenge a nomination petition or names upon a petition that the Secretary of State has certified as valid and accepted. *Id.* It does not provide recourse where, as here, it is alleged that a nomination petition or names upon a petition were improperly denied validation. *Id.*

But, the voters' focus is too narrow. They had a right to challenge the registrars' refusal to certify their names (or the names of other voters) under the Maine Administrative Procedures Act (MAPA). The MAPA provides that "[a]ny person aggrieved by the failure or refusal of an agency to act shall be entitled to judicial review thereof in the Superior Court." 5 M.R.S.A. § 11001. Such an action is instituted "by filing a petition for review in the Superior Court." 5 M.R.S.A. § 11002. "The petition for review shall be filed within 30 days after receipt of notice if taken by a party to the proceeding of which review is sought" and "[a]ny other person aggrieved shall have 40 days from the date the decision was rendered to petition for review." *Id*. "If the review sought is from an agency's failure or refusal to act, the petition for review shall be filed within 6 months of the expiration of the time within which the action should reasonably have occurred." *Id.* After evaluating the merits of a petition, the court may "[r]everse or modify

---

[9] The Court draws this conclusion from *Dobson*. In *Dobson*, the Supreme Judicial Court of Maine cryptically affirmed the Superior Court's judgment, which itself affirmed the Secretary's decision to deny Dobson "a hearing to review the actions of the local election officials." *Dobson* at ¶ 2. It cited 21-A M.R.S.A. § 356(2). *Id.* In her Rule 80C petition, Ms. Dobson had claimed that the Secretary erred in refusing to accord her a hearing under § 356(2)(B). *See Pet. for Review of Final Agency Action* ¶ 13-14, Ex. 8-2 (Docket # 8). In affirming the Superior Court's denial of her Rule 80C petition and citing § 356(2), the Law Court was, in this Court's view, affirming the Secretary's denial of Ms. Dobson's right to a hearing under § 356(2).

the decision [of the agency] if the administrative findings, inferences, conclusions or decisions are . . . [i]n violation of constitutional or statutory provisions."  5 M.R.S.A. § 11007.  Appeals under the MAPA are governed by Rule 80C.  *Palesky v. Sec'y of State,* 711 A.2d 129, 132 (1998). Under Rule 80C(i), a petition for agency review may be joined "with a claim alleging an independent basis for relief from governmental action." Me. R. Civ. P. 80C(i).

After failing to attain the 4,000-signature threshold, on June 10, 2008, Ms. Dobson sought an administrative hearing with the Secretary under § 356(2). *Letter from Attorney Williams to Julie* Ex. 9-4.  In her June 11, 2008 response, Deputy Secretary Flynn explained to Ms. Dobson that as a candidate the § 356 process was unavailable to her.  *Letter from Dep. Sec'y Julie L. Flynn to Lynne A. Williams, Esq.* Exh. 2A to *Flynn Aff.* (stating that the § 356 procedure "is not a process available to a candidate whose petitions were not accepted by the Secretary of State."). Instead, Deputy Flynn informed Ms. Dobson that she could seek review of the Secretary's decision as a final agency action pursuant to the MAPA.  *Id.*  Ms. Dobson followed this advice, initiated a Rule 80C proceeding in the Superior Court, and appealed that court's decision to the Supreme Judicial Court of Maine.  In filing a lawsuit with the Superior Court, Ms. Dobson took advantage of her statutory right to review the Secretary's denial of her attempt to be placed on the ballot.  Although she could have raised her constitutional claims, she elected not to do so. *See Fleming*, 795 A.2d at 695; *Berry*, 663 A.2d at 16.  As such, the voters have no valid due process claim with regards to the remedies available to their candidate.

Neither do the voters have a valid due process claim in their own right.  The voters qualify as persons aggrieved by the Secretary of State's decision in June, and were entitled to initiate their own Rule 80C proceeding to challenge the decision to deny their chosen candidate access to the ballot.  *Def.'s Memo*. at 12; *see Olson v. Secretary of State*, 689 A.2d 605 (Me.

19

1997) (recognizing seven Maine voters' rights to pursue a Rule 80C proceeding after the Secretary of State denied their request to reformulate a ballot question for a citizen initiative). As with Ms. Dobson, the voters could have pursued all legal theories in a Rule 80C action, including their constitutional claims. *See Fleming*, 795 A.2d at 695; *Berry*, 663 A.2d at 16.

It is difficult to correlate the asserted position of each plaintiff with the remedy each is seeking. None of the plaintiffs alleged a separate constitutional wrong, such as a denial of their voting rights due to racial or gender discrimination. Instead, they each assert that they have been denied the right to have the candidate of their choice on the printed ballot. But, they have not asserted rights as a class that, with the certified signatures, would exceed the number of signatures to meet the 4,000 statutory requirement. In fact, to the contrary, it appears that local officials certified the signatures of four of the five Plaintiffs and the Secretary counted their signatures. In any event, adding four votes to the number of certified voters would not bring the total of certified signatures to the statutory minimum.

The remaining voter, Christian Venable, alleges that he "was erroneously not certified by local election officials, and thus not counted by the Secretary of State as a registered voter." *Compl.* ¶ 2. Unlike the other Plaintiffs, Mr. Venable might argue that he was denied due process by the failure of the Secretary to count his specific signature in support of Ms. Dobson. However, the remedy for that claim would be to have his signature counted, not the extraordinary steps he requests the Court to order. Ms. Dobson filed 3,840 properly-certified signatures with the Secretary of State by the June 2 deadline, 160 signatures short of the 4,000 required. *Flynn Aff.* ¶ 5. Even if Mr. Venable's signature were wrongly denied certification, Ms.

Dobson would still be 159 signatures shy of the minimum.[10]  In the Court's view, Mr. Venable has not demonstrated standing to seek Ms. Dobson's inclusion on the ballot based on the failure of a municipal official to certify his signature alone.

The Court need not rely on standing, however, to find that Mr. Venable was not denied due process.  It is unclear what exactly Mr. Venable means when he asserts that his signature "was erroneously not certified by local election officials, and thus not counted by the Secretary of State as a registered voter." *Compl.* ¶ 2.  The Secretary's attorney stated at oral argument that she understands that Mr. Venable is claiming he was a registered voter as of June 2, 2008, but that a municipal official failed to certify his signature.  If true, the Secretary represented that Rule 80C would have been available to him to challenge that error and Mr. Venable's vote would have been counted even if resolution of the challenge occurred after the June 2, 2008 deadline.  Plaintiff's did not refute or correct the Secretary's interpretation of Mr. Venable's situation during oral argument and, assuming he was a registered voter, he was not denied due process, since Rule 80C would have been available to him.

Even under an alternative set of facts, Mr. Venable has not been denied due process.  If the registrar either canceled Mr. Venable's registration or rejected his voter registration application he could have appealed that decision to a registration appeals board under 21-A M.R.S.A. § 103.  The appeals board would then have been obligated to hold a hearing a minimum of 20 days after receipt of the appeal.  21-A M.R.S.A. § 103(6).  The board's decision would have been subject to Superior Court review under Rule 80B.  *Id.*

Plaintiffs focus considerable attention on alleged inadequacies of the 21-A M.R.S.A. § 103 process.  They contend that the minimum 20-day lag between the filing of an appeal and an

---

[10] As with the other four voters, Mr. Venable does not claim to represent a class of similarly situated voters and so the Court need not rule on whether such a class which with the certified signatures reached 4,000 voters might have standing to obtain the sought after relief.

appeal board hearing "effectively move[s] the deadline for submission of signatures to municipal election officials back 30 days or more." *Compl.* ¶ 39. The Plaintiffs fail, however, to explain how the alleged inadequacies of § 103 affected Ms. Dobson's candidacy.[11] With the exception of Mr. Venable, who may or may not have been denied certification because of a § 103-triggering reason, there is no indication that the named plaintiffs, or any of the other uncertified petition signers were denied certification for the reasons giving rise to a § 103 proceeding.

The Court concludes that the Plaintiffs have failed to show a likelihood of success on the merits on Count Two.

## III.  CONCLUSION

The Court DENIES Plaintiffs' Emergency Motion for a Preliminary Injunction and Temporary Restraining Order (Docket # 4).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 16th day of September, 2008

---

[11] Mr. Venable fails to allege facts that support his contention that the timing provisions in the § 103 procedure effectively prevented him from contesting the registrar's failure to certify his name. The Complaint does not allege when Mr. Venable signed Ms. Dobson's nomination petition and for purposes of assessing whether to grant the extraordinary emergency relief he demands, the Court cannot assume facts that have neither been pleaded nor otherwise clarified.